**JOHN F. LAURO**
*Member of FL, NY, & DC Bars*
jlauro@laurolawfirm.com

**SCOTT J. FLINT**
*Member of FL Bar*
sflint@laurolawfirm.com

**GUS M. CENTRONE**
*Member of FL Bar*
gcentrone@laurolawfirm.com

**FLORIDA**
Bank of America Plaza
101 East Kennedy Blvd.
Suite 3100
Tampa, Florida 33602
P: 813.222.8990
F: 813.222.8991

**NEW YORK**
1540 Broadway
Suite 1604
New York, New York 10036
P: 646.746.8659
F: 212.938.0858

John F. Lauro, P.A.
WWW.LAUROLAWFIRM.COM

LAURO LAW FIRM

FLORIDA · NEW YORK

**By Electronic Filing**

May 19, 2008

Honorable Carol Bagley Amon
United States District Judge
United States District Court
   Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:     U.S. v. Timothy Donaghy (Case No. 1:07-cr-00587)

Dear Judge Amon:

We respectfully submit the following letter in connection with Timothy Donaghy's sentencing. Although we had intended to file this with the Court last week, we just received the government's loss calculation letter and wanted to respond to it herein. For the reasons discussed below, we respectfully suggest that a sentence of probation would be reasonable in order to fulfill the goals of sentencing set forth under the United States Sentencing Guidelines ("U.S.S.G.").

## I. Introduction

Tim Donaghy's tragic fall from grace cannot be explained without understanding the psychological demon that he lived with for many years. Tim had a wonderful life – a successful career as a National Basketball Association ("NBA") referee, a happy and stable marriage, and the love of four young daughters. Nothing in Tim's background or upbringing would suggest that he would be on the adverse side of a federal indictment. Yet, as so often in life, the perception of reality is far different than its actual circumstances.

Tim suffers from a pathological gambling condition, which went undetected for many years. The disease caused behavior that contradicted everything about how Tim led his life. Compulsive gambling is an addiction with characteristics similar to those of drug or alcohol abuse. The condition contributed to conduct that makes little sense to the outside world, but its effects are destructive nonetheless. In this case, Tim participated in gambling activities involving NBA games, even though he obtained minimal financial gain.

A clinician would say that Tim's illness revolves around the compulsive need to engage in self-destructive activity. Tim, though, held no self-delusional justifications for his conduct. When Tim learned of the government's investigation, he cooperated immediately, well before the government had proof of his participation in these activities. He accepted responsibility for his actions and provided substantial assistance to the government in connection with the prosecution of other individuals. Prior to entering into a plea agreement, Tim met with federal prosecutors and agents in

Honorable Carol B. Amon
May 12, 2008
Page 2 of 27

order to provide crucial information regarding the activities of other individuals who later pled guilty in this matter. He also offered assistance with respect to NBA activities that were of interest to federal law enforcement, but completely unrelated to his gambling activities.

Besides his cooperation, Tim also obtained treatment for his condition. He participates in regular therapy sessions with a certified gambling counselor. Tim also attends regular Gamblers Anonymous meetings. Without doubt, Tim made significant errors in judgment, but he also tried to right the wrongs of his conduct by assisting the government and seeking treatment for his disorder.

However, the most salient feature of this case is the gross disparity in the sentencing guidelines calculations for Tim and the individuals charged as a result of his timely cooperation. For reasons known only to the government, other individuals involved in this matter – who did not cooperate and provide substantial assistance – are subject to sentences far less severe than that faced by Tim. Indeed, on the eve of trial of two individuals, the United States Attorney's Office for the Eastern District of New York ("USAO") agreed to plea agreements that can only be described as aberrant and counter-intuitive. The plea agreements were contrary to established Department of Justice policy.[1] In one instance, conspiracy and perjury charges were dropped against an individual who lied before a federal grand jury and obstructed justice, and in another instance, mail fraud conspiracy charges were dropped for an individual with admitted ties to organized crime.

The USAO failed to prosecute these and other individuals to the full extent of the law, thereby leading to the disparities discussed below.[2] The disparities cannot be explained in terms of normal prosecutorial decision-making. Indeed, the USAO is taking a unique approach – punish an early and truthful cooperator more severely than other defendants who acted contrary to the interests of the government. Rather than explaining the reasons for this disparate treatment, the USAO has surrounded this case with a cone of silence.[3]

---

[1] See Memorandum from John Ashcroft, U.S. Att'y Gen., to All Federal Prosecutors on Department Policy Concerning Charging Criminal Offenses, Disposition of Charges, and Sentencing, Introductory Comment. (Sept. 22, 2003) ("Ashcroft Memorandum) (requires that "federal prosecutors ... charge and pursue the most serious, readily provable offense or offenses that are supportable by the facts of the case."). The USAO followed the Ashcroft Memorandum in connection with the prosecution of Tim, but declined to adhere to it with respect to those who sought to obstruct the investigation and prevent the government from learning the true facts of this matter.

[2] Nothing described herein should be construed as criticism of the FBI agents who carried out the investigation in this case. Indeed, because of the exhaustive efforts of these dedicated agents, the USAO was provided with a full understanding of the facts relevant to this important matter.

[3] If, for example, the NBA pressured the USAO into shutting down this prosecution to avoid the disclosure of information unrelated to Tim's conduct, then that fact would be an important sentencing consideration for the Court.

## II. Personal Background and Characteristics

### A.    Mr. Donaghy Was Raised In A Supportive Family

Tim was born on January 7, 1967, in Delaware County, Pennsylvania, to a loving and caring family. The Donaghy household was strict and religious. Tim's parents, Gerald and Joan Donaghy, insisted on moral conduct. Tim and his brothers, Kevin, James, and Christopher, attended Catholic schools and all of the children graduated from college.    Tim's parents provided a strong family foundation and were always supportive of their children.

Tim was taught the values of hard work, family, and education. Gerald Donaghy worked in the purchasing department at General Electric. He had a second job as a basketball referee for the National Collegiate Athletic Association ("NCAA"). Gerald was a highly-respected referee and officiated three Final Four competitions. When school was not in session, Tim would travel with his father to watch him officiate. Their mutual love of basketball created an important bond between Tim and his dad.

As part of his job, Tim's dad often officiated college basketball games until the early hours of the morning. Following a basketball game and little sleep, Gerald would return to his job the next day at General Electric. Despite working two jobs, Gerald was always involved fully in his children's lives. He was a strict disciplinarian, who insisted that the boys play by the rules. He also always stressed the importance of education in enriching their lives.

Tim's mother nurtured a caring family environment. Like Gerald, Joan also instilled in Tim the value of education. She recognized early that Tim had difficulty learning so she frequently helped him with his homework.    Moreover, she worked as an administrative assistant at Villanova University, which ensured that the family could afford to send the children to college. Joan is a soft-spoken woman who always put her family ahead of herself. Tim is particularly close to his mother and they talk on the telephone every day. Joan always taught Tim to keep a positive attitude, even when a situation looks bleak. She has been a source of strength for Tim in these difficult times.

While Tim's three brothers excelled as students, consistently earning top grades in school, Tim struggled academically throughout his childhood.    However, Tim developed a passion for sports. As a child, he dreamed of becoming a professional athlete. He played for his high school basketball and baseball teams.

After graduating from high school, Tim attended Villanova University at night. He made the varsity baseball team, but quit after two months because he needed to earn money to stay in school. Tim struggled to support himself financially through college by working at a seafood market during the day. Nevertheless, Tim dedicated himself

Honorable Carol B. Amon
May 12, 2008
Page 4 of 27

to his studies and made the Dean's List.  He graduated from Villanova with degrees in English and psychology.

Tim's parents are now retired and living in Sea Isle, New Jersey. They have been married nearly fifty years.  Tim's oldest brother, Kevin Donaghy, is an electrical engineer, and is engaged to be married.  His younger brother, Christopher Donaghy, is chemical engineer with a wife, two daughters, and a son.  Tim's middle brother, James, is a dentist with two sons.

### B.    Mr. Donaghy's Career As An NBA Referee

After college, Tim held several jobs, but found none of them satisfying.  He was an insurance adjustor with the Erie Insurance Co. and later sold industrial packing machines.  Tim also worked for a cellular telephone company, where he managed service contracts.  In his spare time, he officiated high school basketball games and thought about becoming involved in professional sports.  When Tim expressed his unhappiness to his mother, she suggested he pursue an officiating career like his dad.

Tim applied for a referee position with the NBA in 1990, but received no response.  In the meantime, he improved his officiating skills at a camp in South Carolina.  There, Tim met Aaron Wade ("Wade"), who oversaw referee development for the NBA.  Tim worked hard at the camp.  Wade later offered Tim a job officiating games for the NBA's professional summer league in Los Angeles.  Tim took the job.

Following Tim's work at the summer league, Wade offered Tim a part-time position as a referee with the Continental Basketball Association ("CBA").  At the time, the CBA operated as a minor league for the National Basketball Association ("NBA"); both players and referees saw it as an excellent opportunity to be hired by the NBA.

The pay, though, was minimal.  As a part-time referee, Tim earned about $10,000 per year.  He lived with his parents while trying to reach the NBA.  He also worked other jobs to support himself, including for a funeral home and later as a substitute teacher.  Eventually, the CBA offered Tim a position as a full-time referee.

Tim was an outstanding referee with the CBA, which moved his career forward.  In 1994, the NBA invited Tim to referee several pre-season games, which provided an excellent opportunity to demonstrate Tim's skills to other NBA officials.  In 1994, the NBA offered Tim a position as a referee, which he accepted immediately.   He was only 26-years old at the time.

Tim was a referee with the NBA from 1994 until July 2007.  Officiating his first professional basketball game was a very special moment in Tim's life.  His years of hard work had finally paid off.  He was able to work with athletes at the highest level.  Tim's dedication to his work led him to become known as one of the NBA's best referees.   The NBA tracks the progress of referees closely, and Tim consistently

received positive feedback.  Tim regularly received favorable evaluations from his group supervisor.  Moreover, Ronnie Nunn, the NBA Director of Officials, expressed complete confidence in Tim's abilities.  The NBA appoints the most able officials to work playoff games and those officials receive bonus pay.  In his career, Tim officiated more than 20 playoff games, which was a testament to his hard work and skill.

### C.    Mr. Donaghy's Relationship With His Wife And Children

Besides his NBA career, Tim has been committed to his own family.  Tim and his wife, Kimberly, were married on May 27, 1995.  They met while Tim was trying to become an NBA referee, and Kimberly encouraged Tim to pursue his goal.  When Tim joined the NBA, Kimberly understood that his job required him to travel for several weeks every month.  She cared for their four children while Tim was away.  Likewise, Tim supported Kimberly.  When Kimberly's father died in 2004, she had concerns about her mother living alone.  Tim thought that the family should move to Sarasota, Florida (which they did) so Kimberly could be close to her mother.

Tim and Kimberly have four daughters: Meghan, Shannon, Bridget, and Molly, ranging in age from six to twelve.  By all accounts, Tim is a terrific father.  Although he had a demanding job requiring him to be away from his family, Tim always gave his children special attention.  He called home to speak with them many times a day and has always been central to their lives.  Because summer is the NBA off-season, Tim could spend more time with his children during those months.  He regularly attends all of his daughters' school and athletic events and coaches a girl's basketball team.

Recently, Kimberly needed to work full time, and Tim became primarily responsible for the children.  He prepares meals for the girls and gets them ready for school. He also drives them to and from school everyday.  Tim is involved deeply in his children's lives.  Without question, he is a loving and devoted father.

### D.    Mr. Donaghy's Numerous Charitable Activities

As the Court is aware, Tim has participated in numerous charitable activities.[4]  While in college, he devoted considerable time to volunteer projects, including helping disadvantaged and disabled children.   For example, he participated in Special Olympics events at Villanova University.  He was responsible for setting up activities for mentally and physically challenged young adults.

In 1998, Tim established an annual basketball camp at the Don Guanella School in Springfield, Pennsylvania.  The School was created in 1960 as a residential facility for mentally challenged young men.  Tim recruited other NBA referees to help him at his camp.   The referees taught the children basketball techniques.   In addition, Tim officiated a basketball game among the children.  He also participated in the School's

---

[4] We understand that the Court has letters describing Tim's charitable activities.

Honorable Carol B. Amon
May 12, 2008
Page 6 of 27

Challenger Baseball team. Each year the Don Guanella School held an annual banquet, where Tim spoke and distributed trophies to the children. He called the children frequently throughout the year and kept up with their activities. He often bought food and Christmas presents for the children. Tim solicited donations for the school from local businesses. In 2000, the NBA awarded Tim the Referee Community Service Award for his involvement with the Don Guanella School.

In 2001, Tim learned of an event in Philadelphia involving Sara Fox, a five-year old girl suffering from leukemia. Her house was robbed and the thieves stole her television, which Tim replaced. The Philadelphia Daily News quoted Tim as saying, "I have three daughters of my own. . . God forbid if that ever happened to us and I wasn't in the position I'm in, I hope somebody would step up and help us out." Jill Porter, *Readers Deluge Leukemia, Burglary Victim With Offers Of Help*, Phil. Daily News, July 18, 2001, at Local 3.

After the Donaghys moved from Pennsylvania to Florida in 2004, Tim remained active in community activities. He became involved with the Sarasota Youth Sports League, which organizes and promotes youth athletics. He coached sports teams. During summers, he spent six hours a day for a week at a youth camp, teaching children sports techniques. He also created a scholarship for the benefit of children who could not otherwise afford to participate in the league.

When Tim learned that a young girl in his neighborhood, Payton Wright, was suffering from a rare form of brain cancer, he raised money for her treatment. Payton was diagnosed with a condition that led to paralysis and blindness. Ordinarily, NBA referees are not permitted to seek autographs from basketball players. However, the NBA exempts the annual All-Star Game from that rule. Tim donated a jersey to be auctioned off to raise money for Payton's treatment.

Tim also participated in the NBA's Read to Achieve program. He traveled to inner-city schools with other NBA referees and players, who read stories to underprivileged children and discussed the benefits of reading.

Tim's long history of charity and community service continues to this day. He volunteers several hours a week at a retirement home in Florida, feeding elderly residents and keeping them company.

### E.      Mr. Donaghy Has A History Of Severe Gambling Addiction That Substantially Contributed To The Instant Offense

Despite Tim's generosity, commitment to his family, and dedication to his work, he harbored a dark secret – a gambling addiction. Indeed, Tim's abberant conduct can only be understood in the context of this crippling disease, which prevented him from exercising complete rational self control. Gambling became like a drug for Tim, and drew him towards increasingly greater risk situations. Gamblers crave "the action" or

the euphoria of betting on events, but also seek self-destructive activity. Often they engage in unlawful activity – where there is little potential financial gain and the likely downside risks are enormous. Such is the case here.

In the late 1990's, Tim joined a country club in West Chester, Pennsylvania, where he became friendly with a group of members who made gambling a way of life. They bet on golf and played card games at the club or in casinos. Initially, Tim engaged in this activity as a way to fit in among a new group of friends. However, once Tim experienced the excitement he felt from gambling, he wanted more. His gambling increased dramatically and eventually became uncontrollable.

Tim began to take risks with his family's financial future. He engaged in aggressive day-trading with a Merrill Lynch investment account, losing more than $30,000. The brokerage firm warned Tim about excessive trading. However, Tim's gambling became a powerful force in his life. He bought thousands of dollars worth of securities on margin.

In early 2004, Tim and friends visited a casino in Atlantic City, New Jersey, and gambled for twelve hours. Tim watched a friend play three different hands of blackjack at once, winning and losing thousands of dollars in a matter of minutes. He felt an unforgettable sense of euphoria, which is characteristic of addicted gamblers.

Tim kept his activities secret from his family. While Kimberly knew that he gambled on occasion, she had no idea how obsessed he had become with gambling. His family was unaware that Tim had a serious problem; however, Kimberly noticed he always seemed on edge. When Tim was not working or spending time with his family, he was gambling.

Tim's gambling addiction led to his involvement in sports betting. Tim knew that the NBA prohibited betting on sporting events and that he risked losing his job by engaging in such activities, but he was unable to control his addiction. He craved the sense of euphoria that came with gambling. Tim and a friend, Jack Concannon ("Concannon"), began betting on college and professional football, baseball, and hockey. The two made selections, but Concannon placed the bets with a local bookmaker, Peter Ruggieri ("Ruggieri").[5] They bet on dozens of games every weekend, winning and losing thousands of dollars. Eventually, Tim and Concannon also began betting on NBA games, which was contrary to league rules. When Concannon lost money at casinos, he pressured Tim to use his knowledge to help select likely basketball teams that they could bet on. They also placed bets on games Tim officiated. Tim knew that his participation in gambling could result in his losing his job, but this type of self-destructive behavior is also common among pathological gamblers.

---

[5] To our knowledge, the USAO has not charged Concannon or Ruggieri for their participation in gambling activities.

Honorable Carol B. Amon
May 12, 2008
Page 8 of 27

### i. Mr. Donaghy's Involvement With Martino And Battista

Tim attended Cardinal O'Hara high school in Pennsylvania with Thomas Martino ("Martino") and James Battista ("Battista"), who have also been indicted in this case as a result of Tim's cooperation.  Tim and Martino socialized occasionally while Tim attended Villanova and later when he became a referee.  Tim was never close with Battista, who had become a professional gambler and bookmaker, with professed ties to organized crime.

In 1994, Battista telephoned Tim during his first year as an NBA referee.  Battista asked Tim whether he was going to be "up and up," which Tim understood to mean whether he would use his position to help Battista gamble.  Tim told Battista to never call again.  When he next spoke with Martino, he told Martino that if Battista ever called again, he would report Battista to the authorities.

However, years later, Battista learned (probably through Ruggieri) that Tim and Concannon had been betting on sporting events.  We believe that Battista (once again through Ruggieri) may have been betting secretly on the selections Tim made with Concannon.  At one point, Tim and Concannon stopped betting on sports, and Battista apparently became angry.  Battista then used Martino to contact Tim.  On December 12, 2006, Tim was in Philadelphia to officiate a game between Boston and Philadelphia.  Tim planned to meet Martino for dinner in Philadelphia.  When Martino picked Tim up at the airport, Battista was in the car.

Martino and Battista drove Tim back to the hotel.  During the car ride, Battista said that he knew Tim bet on NBA games with Concannon.  Battista wanted Tim to help him select bets.  Battista told Tim that he would report Tim's gambling activities to the NBA if Tim did not provide selections.  Later, at the hotel restaurant, Battista told Tim to call Martino in order to relay selections.  In return, Battista agreed to pay Tim $2,000 for each correct selection.  If Tim's selection did not win, he would receive nothing.  Battista also threatened Tim's family, stating that Tim would not want people from New York (mafia figures) visiting his wife and kids.[6]  *See* Letter dated May 8, 2008 from AUSA Jeffrey A. Goldberg to the Court ("5K1.1 Letter") at 3.

Battista, Martino, and Tim participated in these actions for approximately four months, and bet on about 30 games.  We believe Battista profited by possibly more than hundreds of thousands of dollars in winnings.  Tim obtained a net gain of about $25,000 from Battista for his participation in those activities.

---

[6] Battista conduct in this regard makes the USAO's policy of leniency towards him even more inexplicable.  For some reason, the USAO allowed Battista to walk from the most serious charges in this case, despite Battista's use of his avowed mob ties to threaten Tim.

Honorable Carol B. Amon
May 12, 2008
Page 9 of 27

### F. Mr. Donaghy Initiated Cooperation Prior To The Government Contacting Him

On June 10, 2007, Tim learned that federal officials were investigating Battista and an NBA referee's involvement in sports betting. Tim's first instinct was to admit his participation in the gambling activities and cooperate with the authorities. Almost immediately, Tim retained counsel, who contacted government. Indeed, the government has recognized that, "[p]rior to that point, the government had not approached Donaghy, nor had the government publicly disclosed that it was investigating him." 5K1.1 Letter at 5. Tim insisted on meeting with federal officials to begin his cooperation immediately.

We do not believe that, prior to Tim's cooperation, the government possessed a full understanding of the gambling conduct in this case. In its submission, the USAO acknowledges that the assistance Tim provided was "significant both in its timing and its scope." 5K1.1 Letter at 6. The USAO recognized that "it was Donaghy who approached the government – not the other way around – and that he did so prior to the filing of any complaint or indictment. Moreover . . . no government agent had made contact with Donaghy." 5K1.1 Letter at 6. Tim provided valuable assistance that aided the investigation considerably. Tim saved the government thousands of hours of law enforcement time by cooperating so quickly and telling the full story. Further, the USAO acknowledges in its 5K1.1 Letter that it spent "considerable time preparing" Tim to testify at the Martino/Battista trial, in the event it went forward. 5K1.1 Letter at 7.

Tim participated in the first proffer session on June 15, 2007, days after learning of the investigation. As the government indicates, Tim provided crucial facts to government investigators. He informed the government of "the details of the conspiracy – how it began, how the scheme was carried out, and who played what role," including the significant roles of Batista and Martino in the gambling operation. 5K1.1 Letter at 6. Without doubt, Batista held a leadership role by obtaining the information and placing the bets. Tim also described Martino's role in terms of acting as a pivotal "go-between" in passing selections to Batista. The AUSA conducting the proffer noted that he had never before seen a cooperator so truthful and forthcoming in a first meeting.

The proffer sessions continued throughout the summer of 2007, and were followed by extensive telephone conferences that continue to this day. Tim's cooperation initially focused on his gambling activities, including his relationships with Concannon, Ruggieri, and others. 5K1.1 Letter at 7. Eventually, though, the assistance expanded greatly to include NBA-related matters that were of interest to law enforcement officials. These matters had nothing to do with improper activities by Tim, but involved practices well-known to NBA insiders. For example, Tim described the gambling activities of NBA officials, which were contrary to league rules. 5K1.1 Letter at 7. He also furnished information concerning circumstances that favored certain players or

Honorable Carol B. Amon
May 12, 2008
Page 10 of 27

teams over others. In one instance, for example, confidential information was secretly passed from another referee to a coach.

We believe that Tim's information will lead to future reforms that will change the way in which the NBA conducts itself. The NBA allowed an environment to exist that made inside information, including knowledge of the particular officials who would work a game, valuable in connection with predicting the outcome of games. For example, particular relationships between officials and coaches or players affected the outcome of games, and other practices prevented games from being played on a level playing field.

Tim never exaggerated the facts or suggested that others played a more significant role than was actually the case. The government commended Donaghy's cooperation in every way, describing him as "at all times cooperative, forthcoming, candid, and always willing to assist the government when needed. In addition, in contrast to other cooperating witnesses, Donaghy never complained about the affect [sic] such preparation had on his personal responsibilities, even when he was required to travel – often on short notice – from his home in Florida to the government's Brooklyn office." 5K1.1 Letter at 7-8.

Simply put, Tim served as a model cooperator. This exceptional cooperation should be recognized with a significant downward departure in the sentencing guidelines calculation.[7]

### G.    Mr. Donaghy Becomes The Subject Of Extreme Media Scrutiny

During Tim's confidential cooperation in the summer of 2007, we understand that NBA officials were alerted to the existence of the investigation. Almost immediately thereafter, Tim's role became known to the press, to the detriment of law enforcement's interest in maintaining the secrecy of the investigation and Tim's efforts to continue his cooperation. Following reports of Tim's involvement in these matters, counsel attempted to contact the league in an effort to provide assistance consistent with Tim's federal cooperation. These efforts by Tim's counsel were rejected by the NBA, and instead the NBA Commissioner made public statements characterizing Tim as "rogue, isolated criminal" and comparing him to an espionage agent.

Thereafter, the media descended on Tim and his family. His home in Florida was surrounded by news reporters and media helicopters circled over the family house. Tim could not leave his home freely for weeks. Reporters waited outside Tim's home and repeatedly harassed family members and neighbors. It is impossible to appreciate this kind of media attention unless one has lived through it. Family dinners were

---

[7] Although the USAO accurately describes Tim's assistance with respect to the activities of Martino, Battista, and others, it declined to advise the Court fully about Tim's extensive cooperation with respect activities involving the NBA that had nothing to do with the instant offense.

interrupted by flashing lightbulbs and reporters knocking on the door, and Tim's four young daughters believed they were under siege.

Tim also received harassing calls and death threats. He kept the FBI advised of the threats and reported them to local law enforcement. Needless to say, these events took a toll on Tim and his family. Tim moved his wife and family to a new location, but the media attention persisted, and included sensational stories about Tim's personal life. Naturally, Tim felt entirely responsible for having his family live through this horror, and he sank into a depression, which required treatment. Tim's family has certainly endured the consequences of his actions, bringing yet more pain to Tim. Clearly, the extraordinary media attention in this case places Tim in a category different from the usual offender, and resulted in a form of punishment to Tim that can only be described as substantial and significant.

Tim and Kimberly are now in divorce proceedings. Tim has moved out of the home and is trying to find a way to support his family. His career is over, his personal life is in shambles, and he faces an uncertain future.

## III. Sentencing Factors Under the Guidelines

### A.    The Applicable Sentencing Standard

Under *United States v. Booker*, 543 U.S. 220 (2005), and its progeny, a sentencing court should calculate a reasonable sentence using a two-step process. *Gall v. United States*, 128 S.Ct. 586, 596 (2007). First, the Court considers the applicable guidelines sentence by first determining the base offense level. U.S.S.G. § 1B1.1(b). The Court then applies any appropriate specific offense characteristics, cross references, or special instructions in the order listed in the guidelines. *Id*. Next, the Court should apply any Chapter Three adjustments. *Id*. at (c)-(e). Thereafter, the Court determines a defendant's criminal history and then computes a guideline range. *Id*. at (f), (g). Finally, the Court should consider any basis for a guidelines departure under Chapter Five. *Id*. at (h), (i); *see United States v. Crosby*, 397 F.3d 103, 112 (2d. Cir. 2005) ("The applicable Guidelines range is normally to be determined in the same manner as before *Booker/Fanfan*.").

In the second step of the sentencing process, the Court assesses the factors in 18 U.S.C. § 3553(a), including: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide for just punishment; (3) the need for deterrence; (4) the kinds of sentences available; and (5) the need to avoid unwanted sentencing disparities. *See United States v. Sindima*, 488 F.3d 81, 84 (2d Cir. 2007); *United States v. Cavera*, 505 F.3d 216, 220 (2d Cir. 2007). A "reasonable" sentence is one that is "sufficient, but not greater than necessary, to comply with the purposes" of criminal punishment: retribution, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a); *see also* S. Rep. No. 98-225, at 75-76 (1983).

The Supreme Court has recognized that a sentence in the guidelines range is not always appropriate. *Rita v. United States*, 127 S. Ct. 2456, 2468 (2007) (*citing Booker*, 543 U.S. at 259, 260). Rather, courts should exercise "reasoned sentencing judgment" by making "an effort to filter the Guidelines' general advice through § 3553(a)'s list of factors." *Id*. In other words, the Court should "consider" the guidelines, but is not required to perform "robotic incantations of its provisions." *See Crosby*, 397 F.3d at 113.

The *Rita* holding was expanded in *Gall*, 128 S.Ct. 586, 596 (2007), which held that sentencing judges "must make an individualized assessment" of the § 3553 factors and "may not presume that the Guidelines range is reasonable." Thus, appellate courts should not presume that a sentence outside the guidelines range is "unreasonable." The Supreme Court reasoned that the "sentencing judge is in a superior position to find facts and judge their import." *Id*. at 597; *see also United States v. Regalado*, Docket No. 05-5739-cr, 2008 WL 577158 at *2 (2d Cir. 2008) (appellate courts "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance.").

Pursuant to the Plea Agreement, Tim pled guilty to: (1) one count of conspiracy to commit wire fraud and (2) one count of conspiracy to transmit wagering information. The wire fraud charge was based on the deprivation of "intangible rights to honest services," pursuant to 18 U.S.C. § 1346. Doc. No. 2, ¶ 9. The Information alleges that Tim deprived the NBA of his honest services by using "inside" information to select likely winners. *Id*.

## B. Count 1: Conspiracy to Commit Wire Fraud

### i. Base Offense Level

Under U.S.S.G. § 2B1.1(a)(1)(A), a violation of 18 U.S.C. § 1343 carries a base offense level of seven.

### ii. Specific Offense Characteristics

#### 1. The Amount Of Actual Loss In This Case Should Be $46,240

Under the guidelines, actual loss is the "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, cmt. 3(A)(i). Further, a defendant's gain may only be used as an alternative measure of loss "if there is a loss but it reasonably cannot be determined." *Id*. at cmt. 3(B).

The Second Circuit has held that only a defendant's salary earned when he was obligated to provide "honest services" should be included in this calculation. *See United States v. Burns*, 104 F.3d 529 (2d Cir. 1997). In *Burns*, the defendant was a

Honorable Carol B. Amon
May 12, 2008
Page 13 of 27

full-time manager for a federally-funded nonprofit agency.  While employed by the
agency, he also enrolled full-time as a graduate student.  He later falsified time sheets
in order to obtain a salary when he was actually acting as a student.  The Second
Circuit affirmed the district court's loss calculation, which included only the defendant's
salary for the period when he failed to perform work for his employer.  In other words,
the defendant's employer lost amounts paid to the defendant only for the period of
time he should have been working for the employer.  The "loss" was not his entire
salary, but only an amount commensurate with the time he was obligated to provide
actual services to his employer.

Further, in *United States v. Leahy*, 464 F.3d 773, 799-800 (7th Cir. 2006), the
defendant pled guilty to charges arising from a scheme involving fraud against
workers' compensation insurers, which lasted from 1989 through 2001.  His
participation, however, began only in 1995.  Nevertheless, in considering loss, the
district court attributed amounts to defendant for activities prior to his involvement in
the wrongful conduct.  The Seventh Circuit held that the district court "erred in
calculating loss based on the entirety of the scheme."  *Id*. at 799.  The district court
incorrectly assumed that Leahy participated in the scheme before 1995, which was
"unsupported by evidence." *Id*.  As in *Burns*, only the portion of the defendant's
conduct that resulted in a financial loss should be included in the loss calculation.

Here, the PSR calculates the actual loss amount by starting with Tim's annual salary of
$260,000.  The PSR then divides that amount by 73 games – the number of games
Tim officiated in the 2006 - 2007 season – resulting in a per game amount of $3,562.
Next, the PSR multiplies $3,562 by 30, which represents the number of games for
which Tim provided a selection, whether or not he was actually a referee for the game,
and reaches a number of $106,860.  Moreover, the PSR then adds $48,000, which
purportedly represents Tim's illicit gains: (1) $30,000 allegedly gained during the
conspiracy and (2) $18,000 allegedly gained from Tim's activities with Concannon,
which predated the conspiracy.  Thus, the PSR alleges that the total loss in this case
is $154,860, which would result in a ten-level enhancement.    U.S.S.G. §
2B1.1(b)(1)(F).

The proper loss number here, however, should be $46,240.  Contrary to the PSR, Tim
was only paid approximately $211,000 for the 2006 - 2007 season.  The remainder of
Tim's salary was withheld by the NBA upon learning of Tim's conduct.  Tim's actual
annual income of $211,000 divided by 73 games is about $2,890.

Further, Tim officiated 16 games for which he provided a selection.  Therefore, Tim
could deprive the NBA of his honest services only for the games he officiated and was
required to provide services to the league.  Like the defendant in *Burns*, Tim's loss
calculation should not include services that he was not obligated to provide to his
employer.  Tim was only paid to officiate NBA games.  Thus, the NBA suffered no
financial loss for games Tim did not officiate, even if he provided selections for those
games.  Moreover, as in *Leahy*, this Court should calculate loss based only Tim's

Honorable Carol B. Amon
May 12, 2008
Page 14 of 27

actual deprivation of services to the NBA, not the "entirety of the scheme." Because Tim deprived the NBA of his services for games he officiated and provided a selection, only those games should be included in the Court's calculation of loss. *See also United States v. Nachamie*, 121 F. Supp. 2d 285, 291 (S.D.N.Y. 2000) ("[L]oss is the value of the money, property, or services unlawfully taken.") Therefore, the loss attributable to Tim's conduct should be $46,240 ($2,890 x 16 games).

Finally, the PSR's calculation combines improperly both "loss" and "gain." PSR ¶¶ 18-20. The PSR adds to the calculation $48,000 as "gain." Under the guidelines, however, "the court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." *See* U.S.S.G. § 2B1.1, cmt. 3(B) (emphasis added); *see also Nachamie*, 121 F. Supp. 2d at 291 ("The offender's gain from committing the fraud is an alternative estimate that will ordinarily underestimate loss.") (emphasis added). As discussed above, "loss" can be calculated by using the number of games that Tim officiated and provided a selection for and multiplying that number by a per game amount. Therefore, none of Tim's alleged gambling gains should be applied to the determination of "loss" under the guidelines.

In sum, the "loss" should be $46,240, which would result in a six-level increase under the guidelines. U.S.S.G. § 2B1.1(b)(1)(D).

### 2. The USAO's Loss Calculations Are Incorrect and Seek to Further Exacerbate the Sentencing Disparities Herein

On May 16, 2008, the USAO filed its loss calculation letter with the Court ("Loss Letter"), setting forth the government's response to U.S.S.G. calculations proposed by the Probation Department and the defense. The USAO took the position that both the Probation Department and the defense had incorrectly calculated loss, and then suggested yet a third approach, which would result in a 12 point enhancement under U.S.S.G. § 2B1.1(b)(1)(H). The USAO agreed with the defense that "loss" should be "based only on those games that Donaghy both referred and provided a pick" in accordance with *Burns*, and that "loss" should not also include any "gain" to Tim. Loss Letter at 7-8.

The USAO, however, seeks to elevate the loss based on so-called "relevant conduct" having nothing to do with the instant offense. Indeed the USAO provides no proof for its calculation relating to this conduct, which was never charged in the Information herein. However, with respect to the loss calculation for the instant offense – Tim's acts during the 2006-2007 season - the USAO and the defense agree that the "loss" should be approximately $45,000 under U.S.S.G. § 2B1.1(b)(1)(D).

The USAO though misinterprets the "relevant conduct" enhancement under the Guidelines and fails to recognize that Tim's prior gambling activities were not related to the instant offense. U.S.S.G. § 1B1.3 provides in relevant part that relevant conduct:

Honorable Carol B. Amon
May 12, 2008
Page 15 of 27

(1) was reasonably foreseeable; (2) was taken in furtherance of the jointly undertaken criminal activity; and (3) occurred during the charged offense, in preparation for it, or to avoid detection or responsibility for it. Under the plain meaning of this Guideline provision, Tim's unrelated gambling activities do not constitute relevant conduct.[8] The Probation Department apparently agreed with our reading of the Guidelines and did not include these amounts in its loss calculation. Nonetheless, the USAO volunteered this provision to enhance Tim's sentence, which also exacerbates sentencing disparities here.

In any event, the USAO office cannot dispute that activities occurring prior to the 2006-2007 season were not part of the charged offense. Indeed Tim's gambling with Concannon had nothing at all to do with the Batista/Martino gambling, and was not reasonably foreseeable with respect to the charged conduct. Tim, for all intents and purposes, had stopped gambling with Concannon during 2006, and it was as a result of this cessation of activity that Batista threatened to expose Tim and harm his family in order to induce Tim to bet with him. The inappropriate activity with Concannon could not have foretold the later approach by Batista who would make extortionate-type threats and allude to supposed mob connections to convince Tim to engage in betting. The two courses of conduct have nothing to do with one another, and the former activity could hardly be deemed "foreseeable" in connection with the later events.

Moreover, the prior Concannon betting was not taken in furtherance of the Batista activity, nor did it occur during the commission of or in preparation for the charged offense. Relevant conduct requires some temporal and logical relationship to the instant charge. Here, the acts and participants were entirely distinct. Finally, the purported relevant conduct was not undertaken to avoid detection or responsibility for the charged conduct.

Perhaps most significant, the USAO has no substantiation for its calculations, which are merely "extrapolations" and estimates from the charged conduct. In contrast to the charged conduct, the USAO provides absolutely no specifics for the relevant conduct "games," including the dates they were played, the teams, the selection, etc. Instead the USAO relies on speculation to suggest a loss number that bears no relationship to reality. Therefore, we request that the Court decline to follow the USAO's loss calculation.

---

[8] *See United States v. Ramirez*, 196 F.3d 895 (8th Cir. 1995). There, the defendant solicited about $1.5 million from Minnesota investors to produce an electric car and absconded with the proceeds. He was later charged with wire fraud, among other things. In calculating loss, the district court included claims from earlier schemes as relevant conduct, arriving at an approximately $3 million loss amount. On appeal the Eighth Circuit held that "[r]elevant conduct for fraud-loss purposes is a fact-intensive issue," and that the government introduced only "limited" evidence at trial to prove its broad proposition that the defendant engaged in a 22-year course of criminal conduct. *Id.* at 898. The court held that the offense of conviction was the defrauding of the Minnesota investors and that "there was no evidence that the twenty forfeiture claimants were involved" in the Minnesota scheme. *Id.* at 899.

Honorable Carol B. Amon
May 12, 2008
Page 16 of 27

### iii.    Abuse of Position of Trust or Use of Special Skill

We acknowledge that a two-level upward adjustment for abuse of a position of trust or use of a special skill is appropriate.  U.S.S.G. § 3B1.3.

### C.    Count 2: Conspiracy to Transmit Wagering Information

#### i.    Base Offense Level

Under U.S.S.G. § 2E3.1(a)(1)(B), a violation of 18 U.S.C. § 1084 carries a base offense level of seven.  There are no specific offense characteristics for this guideline.

#### ii.    Abuse of Position of Trust or Use of Special Skill

As noted above, a two-level upward adjustment for abuse of a position of trust or use of a special skill is appropriate.  U.S.S.G. § 3B1.3.

### D.    Grouping of the Counts

Under U.S.S.G. § 3D1.2(b), counts involving the "same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan" are grouped together.  When counts are grouped, the adjusted offense level is the highest offense level of the counts in the group. U.S.S.G. § 3D1.3(a).  Here, the offense level for Count 1 is 15.  The offense level for Count 2 is 14.  The USPO recommends that the two counts here be grouped.    Thus, the offense level is 15.

### E.    Chapter Three Adjustments

#### i.    Mr. Donaghy Is Entitled to a Three-Level Downward Adjustment for Acceptance of Responsibility

Under the Plea Agreement, Tim is entitled to a three-level downward departure for acceptance of responsibility under U.S.S.G. § 3E1.1.

Tim immediately accepted full responsibility for his conduct and provided extensive cooperation to the government.  Further, by entering a timely guilty plea, he "permit[ted] the government to avoid preparing for a trial and permit[ted] the government and the Court to allocate their resources efficiently." U.S.S.G. § 3E1.1(b). Therefore, Tim should receive a three-level downward adjustment for acceptance of responsibility.

Honorable Carol B. Amon
May 12, 2008
Page 17 of 27

## F.    Criminal History

Tim has no criminal history and therefore falls under Criminal History Category I.

## G.    Chapter Five Departures

### i.    Mr. Donaghy Deserves a Ten-Level Downward Departure Based on the Substantial Assistance He Provided to the Government

As described above, Tim provided extensive assistance to the government in its investigations of Battista, Martino, and others. He provided detailed information to the government regarding other matters of interest to federal law enforcement officials regarding the NBA. Under U.S.S.G. § 5K1.1, upon motion of the government, the Court may depart from the guidelines to recognize that a "defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense." *See United States v. Bruno*, 383 F.3d 65, 91 (2d Cir. 2004). The government filed a 5K1.1 Letter that provides a detailed description of Tim's extraordinary cooperation.

Also, the timing of Tim's cooperation is especially significant. He cooperated before law enforcement officials approached him, and well before the government had built a case against him.

As a result of his cooperation, we respectfully request that his sentencing range be reduced by at least ten levels. *See United States v. Alatsas*, Case No. 06-CR-472 (JBW), 2008 WL 238559 at *2 (E.D.N.Y. Jan. 16, 2008) (court imposes a below-guidelines sentence of probation because, among other things, the defendant provided substantial assistance to the government).

### ii.    Mr. Donaghy Should Receive a Downward Departure of at Least Six Levels Due to Diminished Capacity

We also respectfully request that this Court depart downward under U.S.S.G. § 5K2.13 due to Tim's diminished capacity. A downward departure may be warranted if: (1) the defendant committed the offense while suffering from a significantly reduced mental capacity and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense.[9] *See* U.S.S.G. § 5K2.13.

---

[9] Under U.S.S.G. § 5K2.13, a defendant may not receive a diminished capacity departure under certain conditions, none of which are present here. Therefore, the Court may grant Tim a downward departure for diminished capacity.

Honorable Carol B. Amon
May 12, 2008
Page 18 of 27

    1.      **Compulsive Gambling Is A Disease That Prevents A Person From Exercising Rational Self Control**

As discussed above, Tim suffers from a gambling condition, which is an impulse control disorder that has been recognized by the American Psychiatric Association since 1980. A pathological gambler is a person "who suffers from a chronic and progressive psychological disease . . . . The urge to gamble is triggered by an impulse (an irresistible craving) and the accompanying compulsivity and mental preoccupations are similar to those of other addictions, such as abuse of alcohol and drugs." Linda Berman et al., *Behind the 8-Ball: A Recovery Guide for the Families of Gamblers*, 31 (iUniverse, Inc. 1998) (1992) ("Berman"). Pathological gamblers are "unable to stop or control once they begin to gamble." *See United States v. Liu*, 267 F. Supp. 2d 371, 372-73 (E.D.N.Y. 2003). Moreover, like drug addicts, gamblers develop a tolerance and "higher or more frequent bets are required to obtain the same mood state as before." Berman et al., *supra* at 31.

The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM IV") lists ten symptoms of pathological gambling:
> (1) is preoccupied with gambling (e.g., preoccupied with reliving past gambling experiences, handicapping or planning the next venture, or thinking of ways to get money with which to gamble);
> (2) needs to gamble with increasing amounts of money in order to achieve the desired excitement;
> (3) has repeated unsuccessful efforts to control, cut back, or stop gambling;
> (4) is restless or irritable when attempting to cut down or stop gambling;
> (5) gambles as a way of escaping from problems or of relieving a dysphoric mood (e.g., feelings of helplessness, guilt, anxiety, depression);
> (6) after losing money gambling, often returns another day to get even ("chasing" one's losses);
> (7) lies to family members, therapist, or others to conceal the extent of involvement with gambling;
> (8) has committed illegal acts such as forgery, fraud, theft, or embezzlement to finance gambling;
> (9) has jeopardized or lost a significant relationship, job, or educational or career opportunity because of gambling;
> (10) relies on others to provide money to relieve a desperate financial situation caused by gambling.

DSM-IV at 312-.21. An individual meeting five of those criteria is diagnosed as a "pathological gambler." Tim satisfied seven of the DSM-IV criteria.

Another tool to assess an individual's pathological gambling disorder is the South Oaks Gambling Screen ("SOGS"). The individual is asked the following questions:
> (1) When you gamble, do you go back another day to win back money you lost?

Honorable Carol B. Amon
May 12, 2008
Page 19 of 27

(2) Did you ever gamble longer than you had planned?

(3) Have you ever felt guilty about the way you gamble, or what happens when you gamble?

(4) Have you ever hidden betting slips or other signs of gambling from your spouse or other important people in your life?

(5) Have you ever argued with people you live with over gambling?

(6) Have you ever felt like you would like to stop gambling, but didn't think you could?

Tim answered five SOGS questions in the affirmative, which resulted in a diagnosis of a pathological gambler.

A pathological gambler's psychological response to gambling resembles that of a drug addict using narcotics. In 2001, the Harvard Medical School conducted a study examining the neural responses of gamblers to the prospect of winning and losing money. Hans C. Breiter et al., *Functional Imaging of Neural Responses to Expectancy and Experience of Monetary Gains and Losses*, Neuron, Vol. 30, 619-639, May 2001. The results of the study were "striking" because the researchers found that the physiological response to gambling was identical to that of "euphoria-inducing drugs." *Id.* at 619, 634. The subjects witnessed a game of chance, where they were shown a set of three monetary values. After a delay, they were then told how much they had won or lost. While anticipating the outcome of the games, the subjects' brains produced increased levels of dopamine. When the subjects were rewarded with a monetary gain, neurons in the brain produced the chemical SLEA. Dopamine and SLEA create a sensation of pleasure. Indeed, the study concluded that the chemical activations in the brain "in response to monetary prospects and outcomes overlap those observed in response to cocaine infusions in subjects addicted to cocaine." *Id.* at 634.

Compulsive gambling addiction often goes undetected. *See* Marc N. Potenza et al, *Gender-Related Differences in the Characteristics of Problem Gamblers Using a Gambling Helpline*, 158 Am J Psychiatry 9, Sep. 2001. Unlike other forms of addiction, pathological gambling can go unrecognized "because of its hidden nature. There are no track marks on the arm, no smell of alcohol on the breath, and often both the gambler and his spouse or family are unaware he is hooked. Then one day disastrous consequences . . . jolt . . . the gambler into an awareness of the severity of the problem." Berman et al., *supra* at 50.

## 2. Mr. Donaghy Is Diagnosed As A Pathological Gambler

On January 9, 2008, gambling treatment counselor Stephen M. Block ("Block") evaluated Tim.[10] Block has treated compulsive gamblers for over 32 years. For many years, he worked at the Gamblers Treatment Center, an outpatient program

---

[10] This Court has qualified Block as an expert on pathological gambling disorders. *See United States v. Liu*, 267 F. Supp. 2d 371, 372-73 (E.D.N.Y. 2003).

administered by St. Vincent's Catholic Medical Center in New York City.  He now works for the SAFE Foundation, a privately operated addiction treatment program in Brooklyn, New York. He was also a founding member and president of the New York Council On Problem Gambling, an organization dedicated to raising public awareness about problem gambling throughout New York. Block also evaluates and treats clients for the New York State Department of Probation, Division of Parole and the United States Pretrial Services and United States Probation and Parole Division in the Eastern and Southern Districts of New York.

After administering the DSM-IV and SOGS tests, Block concluded that Tim's behavior was "indicative of the persistent, progressive nature of pathological gambling." *See* Block's Report, attached as Exhibit A, pg. 4.  Block found that Tim "continued to gamble despite the consequences and fear of disclosure of his activities." When Tim would lose a bet "he felt a need to get even and gamble even more.  It was no longer enjoyable or exciting." He also "concealed the extent of his gambling from family and friends." Block opined that "Mr. Donaghy's involvement with illegal activities was a direct result of his gambling behavior.  Mr. Donaghy would never have committed these offenses if he was not a pathological gambler.  His judgment and insight were impaired by his gambling behavior." *Id.*

Since pleading guilty in this case, Tim has received proper treatment for his gambling addiction.  Janice Machler, who is a licensed mental health counselor, a nationally certified gambling counselor, and a certified addictions specialist, treats Tim at least twice a month for therapy sessions. Ms. Machler found Tim to be "sincerely motivated" to abandon his previous gambling addiction because he is "acutely aware of the losses that have resulted from his previous behaviors and tendencies." *See* November 9, 2007 Letter of Janice H. Machler, attached as Exhibit B.   Further, Tim also attends weekly Gamblers Anonymous meetings, which is central to his treatment.

This Court recognizes that pathological gambling is a serious illness that can "interfer[e] with [a defendant's] ability to control behavior that he knew was wrongful." *Liu*, 267 F. Supp. 2d at 375.  In *Liu*, this Court granted a four-level downward departure because, like Tim, the defendant suffered from a pathological gambling addiction. Liu pled guilty to using unauthorized credit card convenience checks issued to other people to obtain $1,000 or more during a one-year period.  This Court considered a DSM-IV analysis and testimony demonstrating that, among other things, Liu had been a habitual gambler for many years and that he had attempted to hide his gambling activities from his wife.  Quoting Mr. Block, the Court recognized that compulsive gambling can often lead to "an increase in isolation and alienation from the family and there certainly is an effect in the same way that the alcoholic family or the drug-addicted family is impacted by the activity of the addict." *Id.* at 376.  *See also United States v. Saldosky*, 234 F.3d 938 (6th Cir. 2000) (affirming district court's two-level downward departure for defendant diagnosed under the DSM-IV as a pathological gambler); *United States v. Checoura*, 176 F. Supp. 2d 310 (D.N.J. 2001) (district court granted two-level downward departure for bookkeeper who embezzled

Honorable Carol B. Amon
May 12, 2008
Page 21 of 27

$4 million from her employer to subsidize vast gambling losses because gambling addiction was direct and substantial cause of offense).

Studies show that attending Gamblers Anonymous and receiving professional therapy constitute crucial elements of a treatment plan for pathological gamblers. *See* Petry et al., *Prevalence, Assessment, and Treatment of Pathological Gambling: A Review*, 50 Psychiatrics Servs. 1021, 1023, Aug. 1999. Treating Tim's disorder would (1) reduce the need for deterrence; (2) make incapacitation by imprisonment to protect the public less appropriate; and (3) render him less deserving of punishment. Moreover, treating a mentally ill person with compassion promotes respect for the law. *United States v. Cantu*, 12 F.3d 1506, 1511 (9th Cir. 1993) ("Lenity is appropriate because the purpose of § 5K2.13 is to treat with some compassion those in whom a reduced mental capacity has contributed to the commission of a crime.").

Compulsive behavior challenges a person's ability to comply with the law, "and so a heavy sentence would not have a significant general deterrent effect on persons in the defendant's class." *See United States v. Miranda*, No. 05 CR 787, 2007 WL 3120098, at *7 (7th Cir. Oct. 26, 2007). If the mental illness is treatable "the goal of incapacitation may not be advanced by a heavy sentence." *Id.* Finally, a person who committed a crime because of mental illness is less deserving of punishment because he is "'not as evil, as worthy therefore of punishment, as one who would not be law abiding even if he were not mentally impaired.'" *Id.*

In this case, we believe that a downward departure and a sentence of probation would fulfill the sentencing goals of Section 3553(a). Tim should be sentenced in a way that would permit his continued treatment. Therefore, we respectfully request that Tim be permitted to continue treatment as part of a probation sentence and the Court depart by at least six levels under U.S.S.G. § 5K2.13.

## IV. Sentencing Factors Under 18 U.S.C. § 3553

After determining an advisory guideline range, the Court should then consider the factors listed in 18 U.S.C. § 3553(a), which include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide for just punishment; (3) the need for deterrence; (4) the kinds of sentences available; and (5) the need to avoid unwanted sentencing disparities. *See United States v. Sindima*, 488 F.3d 81, 84 (2d Cir. 2007).[11] Further, this Court may "place greater reliance" on the Section 3553 factors than the guidelines. *See United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) (court may focus on statutory

---

[11] "[W]hen a court reaches a sentence above or below the recommended Guidelines range through application of Chapters Four or Five of the Sentencing Guidelines, the resulting increase or decrease is referred to as a 'departure.' When a court enhances or detracts from the recommended range through application of § 3553(a) factors, however, the increase or decrease is called a 'variance.'" *United States v. Atencio*, 476 F.3d 1099, 1101 n.1 (10th Cir. 2007).

Honorable Carol B. Amon
May 12, 2008
Page 22 of 27

factors, "as carefully applied to the particular circumstances of the case and of the
human being who will bear the consequences.").

Tim respectfully requests that, after considering the factors set forth in 18 U.S.C. §
3553(a), the Court grant an additional six-level downward variance due to: (1) lower
guidelines ranges for more culpable co-conspirators; (2) Tim's extensive cooperation,
including with respect to activities involving the NBA; (3) his history and characteristics;
and (4) the collateral consequences of the instant offense.

> ### A.    The Decision Of The USAO Not To Properly Prosecute
> ### Individuals To The Full Extent Of The Law Will Lead To
> ### Sentencing Disparities Here

Under 18 U.S.C. § 3553(a)(6), sentencing courts should consider the "need to avoid
unwarranted sentence disparities among defendants with similar records who have
been found guilty of similar conduct." Indeed, in *United States v. Wills*, 476 F.3d 103
(2d Cir. 2007), the Second Circuit held that "it is appropriate for a district court, relying
on its unique knowledge of the totality of the circumstances of a crime and its
participants, to impose a sentence that would better reflect the extent to which the
participants in a crime are similarly (or dissimilarly) situated and tailor the sentences
accordingly." *Id.* at 110 (emphasis in original).

Here, the Court should consider that Tim cooperated extensively with the
government's investigation, yet he faces harsher punishment than individuals who
promoted the scheme and profited significantly from it. As the USAO concedes,
Battista pled guilty to one count of conspiracy to transmit wagering information, but the
USAO stipulated to only a 10 – 16 month range of imprisonment in his plea
agreement. *See* 5K1.1 Letter at 7. As part of that agreement, the USAO also dropped
a charge of conspiracy to commit wire fraud pending against Battista. *Id.* Likewise,
Martino pled guilty to one count of conspiracy to commit wire fraud, but the USAO
agreed to a 12 – 18 month sentencing guidelines range. *Id.* The USAO also dropped
charges of conspiracy and perjury charges against Martino. *Id.*

Battista profited significantly from the scheme, and played a leadership role in the
offense. Further, while Tim began cooperating prior to the government contacting him
about the offense, Battista repeatedly delayed his guilty plea, causing the government
to spend considerable effort preparing for a trial. Yet Tim faces the harshest
punishment among the conspirators. The PSR calculates Tim's sentencing range to
be 21 – 27 months of imprisonment and the USAO suggests a range of between 27 –
33 months of imprisonment. Thus, the PSR and USAO propose guideline ranges for
Tim about 2 – 3 times those for Battista and Martino.

The disparities here result from prosecutorial plea decisions that cannot be explained
in rational terms. Indeed, under the plea bargain approach of the USAO, a cooperator
should be punished more severely than those who engaged in more serious offenses,

Honorable Carol B. Amon
May 12, 2008
Page 23 of 27

such as perjury, extortion, and obstruction of justice. We do know that the USAO had unassailable cases against Martino and Batista. However, on the eve of trial - which would have resulted in the disclosure of details concerning NBA practices unrelated to Tim - the USAO desperately sought "sweet-heart" deals with Martino and Batista that were contrary to established DOJ practices. For example, according to news reports, the USAO made a late night call to Batista's counsel asking him to take the lenient plea offer so that the USAO could avoid a trial in the case. Thus, the USAO helped Battista, an individual with avowed organized crime ties, to obtain an extremely favorable sentencing range.

In addition, despite the importance to criminal law enforcement that individuals testify truthfully before grand juries, the USAO neglected to prosecute Martino for perjury. The USAO's conduct is inconsistent with appropriate prosecutorial decision-making in this regard. Usually, the government prosecutes perjurers to the maximum extent possible.

In light of these circumstances, this Court should grant Tim a downward variance based on sentencing disparities with others involved in this case.

> **B.     Mr. Donaghy Is Entitled to a Variance Due to His
> Extensive Cooperation with the Government Regarding
> Other Individuals And The NBA**

Under 18 U.S.C. § 3553(a)(1), the extent of a defendant's cooperation is part of the totality of the circumstances the Court should consider in determining a reasonable and just sentence. *United States v. Huerta*, 878 F.2d 89, 93 (2d Cir. 1989) (provisions of U.S.S.G. § 5K1.1 do not foreclose a sentencing court from considering a defendant's cooperation when determining a reasonable sentence, regardless of whether the government agrees). Immediately upon learning of the government's investigation, Tim began his cooperation. He retained counsel and contacted the government to provide his assistance. Tim's prompt cooperation aided the government's investigation considerably, and saved the government significant resources.

Moreover, through no fault of Tim, the USAO failed to take full advantage of Tim's cooperation. For instance, the USAO neglected to prosecute others involved in the betting activities described by Tim, despite overwhelming evidence of guilt. Further, Tim provided detailed information concerning NBA-related activities having nothing to do with Tim that improperly influenced the results of games. Although the USAO failed to fully disclose the full extent of Tim's cooperation in this regard, it is a further basis for a variance.

Case 1:07-cr-00587-CBA Document 15 Filed 05/19/08 Page 24 of 27 PageID #: 57

### C.    Mr. Donaghy Deserves a Variance Because of His History and Characteristics

We also believe the Court should grant a variance based on Tim's "history and characteristics." For years, Tim confronted a mental illness that was the substantial cause of his unlawful conduct. Nevertheless, Tim has maintained an otherwise exemplary life, devoting himself to his family and charity work. *See United States v. Gray*, 453 F.3d 1323, 1325 (11th Cir. 2006) (affirming a sentence of less than half the Guideline range where court took into account defendant's personal history and characteristics and his medical condition). Tim is 42-years old and this is his only criminal offense. He has no history of violence. He has maintained a stable employment history for his entire adult life. Therefore, Tim is entitled to a variance due to his history and characteristics.

### D.    Mr. Donaghy Should Receive a Variance Because of Collateral Consequences

We request that the Court consider the collateral consequences suffered by Tim and his family. *United States v. Stone*, 374 F. Supp. 2d 983, 990 (D. N.M. 2005) (court reduced sentence below the guidelines by taking into account that defendant lost his job and his wife left him); *United States v. Samaras*, 390 F. Supp. 2d 805 (E.D. Wis. 2005) (guidelines failed to account that defendant had acted positively before crime, had strong family support, and had a solid educational background and vocational history).

The collateral consequences of this offense on Tim's life cannot be overstated. Such matters are particularly compelling after President Bush commuted I. Lewis Libby's sentence following convictions for obstruction of justice, false statements, and perjury. Libby was sentenced to 30 months incarceration and two years of supervised release. President Bush concluded that the "collateral consequences" from Libby's conviction, including the harm to his family, should be taken into account as part of the punishment for Libby's serious crimes. President Bush commuted the prison portion of Libby's sentence, resulting in a sentence of supervised release rather than imprisonment.[12]

Tim and his family have suffered significantly from the consequences of his involvement in this offense. Tim and Kimberly are divorcing after nearly 13 years of marriage. Tim's career is finished, and his family faces an uncertain financial future. A

---

[12] In his July 2, 2007 statement granting executive clemency for Libby, President Bush wrote in part: "My decision to commute his prison sentence leaves in place a harsh punishment for Mr. Libby. The reputation he gained through his years of public service and professional work in the legal community is forever damaged. His wife and young children have also suffered immensely. He will remain on probation. The significant fines imposed by the judge will remain in effect. The consequences of his felony conviction on his former life as a lawyer, public servant, and private citizen will be long-lasting."

Honorable Carol B. Amon
May 12, 2008
Page 25 of 27

term of imprisonment will only have a further destructive impact upon his family, which
would be exceptionally tragic because Tim has been receiving proper treatment and is
on the path to overcoming his pathological gambling disorder. Tim will never be able
to return to officiating professional sports, and therefore he will never be in a position
to repeat his offense conduct. He also suffered death threats and was willing to
cooperate against a purported associate of organized crime who had threatened him
and his family. Over the last year, he has lived in a virtual prison, unable to find
permanent employment and live a normal life. Thus, we believe that the collateral
consequences to Tim and his family should factor into the Court's sentencing decision.

## V. A Sentence Of Probation Is Appropriate In This Case

A sentence of probation would be "sufficient, but not greater than necessary, to comply
with the purposes" of criminal punishment and promote respect for the law. 18 U.S.C.
§ 3553(a)(2)(A).[13]

The United States Supreme Court recently held that a sentence of probation is not an
"act of leniency," but rather is a "substantial restriction of freedom." *Gall v. United
States*, 128 S.Ct. 586, 596 (2007). In *Gall*, the USPO had recommended a defendant
convicted of drug trafficking receive 30 to 37 months imprisonment. The district court
held that "any term of imprisonment in this case would be counter effective by
depriving society of the contributions of the Defendant who, the Court has found,
understands the consequences of his criminal conduct and is doing everything in his
power to forge a new life. The Defendant's post-offense conduct indicates neither that
he will return to criminal behavior nor that the Defendant is a danger to society." *Id.*
The district granted a variance and imposed a sentence of 36 months probation. *See
also United States v. O'Connor*, Case No. 02-CR-429 (RWS), 2002 WL 31260257 at
*7 (S.D.N.Y. Oct. 9, 2002) (where court found incarceration "unnecessary" and
imposed probation for defendant with an adjusted guidelines offense level of 11 in light
of low minimum sentence of imprisonment and government's 5K1.1 motion).

The Eighth Circuit Court of Appeals reversed the district court, but the Supreme Court
reversed that decision, holding the district court's significant departure from the federal
sentencing guidelines was "reasoned and reasonable." *Gall*, 128 S.Ct. at 602. The
Court further emphasized the severity of a probationary sentence, holding that
"probationers may not leave the judicial district, move, or change jobs without
notifying, and in some cases receiving permission from, their probation officer or the
court. They must report regularly to their probation officer, permit unannounced visits
to their homes, refrain from associating with any person convicted of a felony, and
refrain from excessive drinking." *Id.* at 595-96 (internal citations omitted).

---

[13] Indeed, a prison sentence would be counterproductive in Tim's case since it is unlikely to have any
positive deterrent effect. *See* U.S. SENTENCING COMM'N, MEASURING RECIDIVISM: THE CRIMINAL HISTORY
COMPUTATION OF THE FEDERAL SENTENCING GUIDELINES 28-29 tbls. 9-10, 31 tbl. 12 (May 2004).

In light of *Booker* and *Gall*, district courts have wide discretion in fashioning reasonable sentences. *See United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Here, the Court should exercise its discretion and impose a sentence of probation for Tim. For years, Tim suffered from an undetected disease. That disease jeopardized his family and ended his career. He accepts full responsibility for his actions, and took immediate steps to assist the government. Tim "understands the consequences of his criminal conduct and is doing everything in his power to forge a new life." *Gall*, 128 S.Ct at 593.

In light of all the circumstances of this case, probation is the most appropriate sentence.

## VI.    Mr. Donaghy Should Only Be Required to Pay the Minimum Fine

U.S.S.G. §5E1.2(d) contains the factors that should be considered by the Court when determining the appropriate fine, if any, to impose upon a defendant. Tim's substantial cooperation has demonstrated his respect for the law and that he is deterred from future illegal activity. Tim has not been previously fined, and a fine would impose a substantial burden on Tim and his dependents.

Therefore, Tim respectfully requests that this Court impose the minimum fine under U.S.S.G. § 5E1.2(d).

## VII.   Any Required Restitution Has Been Offset By Amounts
         Withheld By the NBA

Under 18 U.S.C. § 3663A, the Court must order restitution to victims of an offense committed under Title 18 of the United States Code. In calculating restitution, the Court should consider the amount of the loss less the value of "any part of the property that is returned." *Id.* at (b)(1)(B). In *United States v. Coriaty*, 300 F.3d 244 (2d Cir. 2002), the defendant was convicted of wire fraud for fraudulently transferring amounts from his employer's investment account to his own account. After the fraud began, the defendant used his personal funds to return a portion of the stolen money. The Second Circuit affirmed the district court's holding that the proper restitution amount was the amount transferred minus amounts paid back to the employer by the defendant after the fraud began. *Id.* at 252.

As discussed above, the amount of loss to the NBA resulting from Tim's conduct is $46,240. However, the NBA withheld about $49,000 of Tim's annual salary. *See* August 3, 2007 Letter from NBA, attached as Exhibit C. Thus, under 18 U.S.C. § 3663A(b)(1)(B), that amount has been "returned" and should offset the restitution owed to the NBA. *See also United States v. Guthrie*, 64 F.3d 1510, 1515-16 (10th Cir. 1995) (defendant was entitled to have amount of restitution offset by value of services he performed for victim).

Honorable Carol B. Amon
May 12, 2008
Page 27 of 27

## VIII. Conclusion

Based on the above, we respectfully request this Court to determine his final sentencing range to be 0-6 months and to impose a sentence of probation.[14]

Respectfully,

*John F. Lauro*

John F. Lauro

cc:     AUSA Jeffrey A. Goldberg
        USPO Brandon T. Maxon

Enclosures

---

[14] The Court was absolutely correct to adjourn this sentencing until after the Battista and Martino sentencings, and following the Court's review of the PSRs and other information with respect to those defendants.  At the time of last week's status conference, Mr. Donaghy's counsel was unaware that the USAO would take a sentencing position that would accentuate the sentencing disparities herein.  For the reasons discussed above, it is crucial that this Court be aware of <u>all</u> of the facts of this matter in order to render a reasonable sentence.