**JOHN F. LAURO**
*Member of FL, NY, & DC Bars*
jlauro@laurolawfirm.com

**SCOTT J. FLINT**
*Member of FL Bar*
sflint@laurolawfirm.com

**GUS M. CENTRONE**
*Member of FL Bar*
gcentrone@laurolawfirm.com

**FLORIDA**
Bank of America Plaza
101 East Kennedy Blvd.
Suite 3100
Tampa, Florida 33602
P: 813.222.8990
F: 813.222.8991

**NEW YORK**
1540 Broadway
Suite 1604
New York, New York 10036
P: 646.746.8659
F: 212.938.0858

John F. Lauro, P.A.
WWW.LAUROLAWFIRM.COM

# LAURO LAW FIRM
FLORIDA · NEW YORK

**Via Electronic Filing**

June 23, 2008

Honorable Carol Bagley Amon
United States District Court Judge
United States District Court –
   Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

Re:   United States v. Timothy Donaghy
         Case No. 07-CR-587-01

Dear Judge Amon:

This is in response to the National Basketball Association's ("NBA" or "the Organization") submission dated June 17, 2008 ("the Submission"), in opposition to Mr. Donaghy's request for a Rule 17(c) subpoena in this matter. The subpoena is requested so Mr. Donaghy can defend himself in connection with a claim for restitution advanced by the NBA. The NBA, however, refuses to furnish any substantive information regarding its claim and instead continues to engage in a cover up of crucial information affecting this case.

On May 19, 2008, Mr. Donaghy submitted a sentencing letter to the Court describing the extent of his cooperation in this matter, and revealing for the first time that for over a year he provided substantial assistance with respect to certain NBA practices. The activities, carried out by league employees, involved the intentional manipulation of NBA game results, which promoted a culture of corruption throughout the Organization. Upon learning that Mr. Donaghy was a federal cooperating witness regarding inappropriate NBA activities, the Organization struck back.

In a transparent attempt at witness intimidation, the NBA filed a letter on June 5, 2008 (the "Demand Letter"), seeking $1 million in restitution from Mr. Donaghy. Since the inception of this prosecution, the NBA ignored a request from the United States Probation Office ("USPO") for any restitution information, and failed to submit a claim at all.  Mr. Donaghy's sentencing was previously scheduled for dates in November 2007, and  April and May 2008, and at no time prior to those sentencing dates did the NBA seek restitution in this matter. As the Submission reveals, though, the NBA became angry that information about Organization practices became public during the playoff season, and it retaliated by seeking to destroy Mr. Donaghy financially and to leave his family (including four young daughters) destitute. Indeed, according to published reports, an attorney for the NBA (Mr. Schectman) observed that the Organization intends to confiscate Mr. Donaghy's pension. *See* Exhibit A, attached hereto.

Hon. Carol B. Amon
June 23, 2008
Page 2

The message from the NBA is quite clear: if you cooperate in a federal investigation against the Organization, we will take you out.

Furthermore, since the initial restitution request, and following further disclosure of cooperating information damaging to the Organization, the NBA has upped the ante by increasing its restitution demand to $1,395,104.89. Despite its efforts to punish Mr. Donaghy for cooperating pursuant to his plea agreement herein, the NBA offers scant support for its restitution claim, thus prompting Mr. Donaghy's request for issuance of a Rule 17(c) subpoena. Much of the NBA's claim centers on its desire to recoup legal fees for an investigation of the activities of other referees and to address widespread gambling by NBA referees, all of which has nothing to do with Mr. Donaghy. It also appears that the NBA would like to have Mr. Donaghy pay for its legal fees in responding to federal inquiries regarding potential misconduct by the Organization. Thus, the NBA makes a frivolous demand that Mr. Donaghy pay for Organization expenses having nothing to do with his conduct.

The Submission offers little insight into what the NBA claims it is owed in this matter. All we have are a few heavily-redacted documents revealing nothing about the NBA's so-called investigation or what legal services were provided in connection with Mr. Donaghy's case. Instead, the NBA wants Mr. Donaghy to buy hundreds of thousands dollars worth of legal services without knowing what he is paying for. It is not surprising that the Submission discloses little, since the NBA is obviously concerned that producing the full investigation would provide further support for Mr. Donaghy's cooperative efforts.

In any event, the Submission hardly renders the request for a subpoena moot, and if anything, raises more questions than answers – for example why NBA officials and representatives of the U.S Attorney's Office were meeting immediately following Mr. Donaghy's filing of his sentencing letter and why the NBA wants Mr. Donaghy to pay for attorneys engaging in "USAO prep." Submission, Tab 2, p. 29.

The Submission, though, confirms what we had long suspected and previously raised with the Court: the Organization did not want any negative information about this case to emerge "during [the NBA] finals, when its audience is the largest." Submission, p. 2.

**The Proposed Subpoena Should Issue**
**Pursuant to Rule 17(c)**

As set forth in our June 10, 2008 letter to the Court, the subpoena seeks relevant documents required to be produced under Rule 17(c).[1] Indeed, Mr. Donaghy (and

---

[1] Where, as here, a Rule 17(c) subpoena is directed to a third party, the only inquiries are whether the requested documents are material to Mr. Donaghy's defense of the restitution claim and whether the subpoena is unduly oppressive for the producing party. *See United States v. Nachamie*, 91 F. Supp. 2d 552, 563 (S.D.N.Y. 2000); *see also United States v. Stein*, 488 F. Supp. 2d 350, 366 (S.D.N.Y 2007) ("The text of Rule 17(c) alone strongly suggests the conclusion that the subpoena should be enforced

Hon. Carol B. Amon
June 23, 2008
Page 3

only Mr. Donaghy) seeks full sentencing transparency in this matter by ensuring that the Court obtains all material facts relevant to this important proceeding. *See United States v. Orena*, 883 F. Supp. 849, 869 (E.D.N.Y. 1995) (holding that defendant's Rule 17(c) subpoena was proper where documents "may . . . illuminate the factors which led [an individual] to become a prosecution witness and the benefits he obtained by doing so.").

Under 18 U.S.C. § 3663A(b)(4), courts may order restitution to a victim for certain actual losses and expenses incurred while participating in the government's investigation and prosecution of a defendant. However, those actual losses must "directly result[] from the conduct forming the basis for the offense of conviction." *United States v. Germosen*, 139 F.3d 120, 131 (2d. Cir. 1998) (reversing a district court's restitution order where it included amounts lost from uncharged relevant conduct) (internal quotation and citation omitted). Courts should not engage in speculation regarding restitution awards, but should make reasonable determinations based on actual facts. *Cf.* 18 U.S.C. § 3664(a), (d).

Here it is impossible to discern how the NBA's legal fees related to participation in a government investigation or prosecution of Mr. Donaghy, since he began cooperating with the federal government well before the NBA became aware of any misconduct by Mr. Donaghy. Within days of learning about a federal investigation, Mr. Donaghy met with federal authorities, admitted his wrongdoing, and began providing truthful information about the Organization. There was simply no need for the NBA to engage outside counsel to investigate Mr. Donaghy because he was already providing truthful and credible cooperation to the U.S. Attorney's Office and the FBI. As discussed below, much of what the NBA claims in restitution has nothing at all to do with Mr. Donaghy.

Nonetheless, the NBA claims restitution based on the following categories of alleged fees and expenses:

i.   **Mr. Donaghy's Salary**

The Demand Letter originally sought a pro rata sum of Mr. Donaghy's salary during the 2006 – 2007 basketball season based on conduct charged in this case. In its Submission, however, the NBA changed course entirely, and now seeks to include significant sums of Mr. Donaghy's salary from 2003 through 2007, totaling $577,312.89. It is significant that on June 13, 2008, the USPO amended the PSR and recognized that restitution should include only the amount of Mr. Donaghy's salary for

---

unless compliance would be unreasonable or oppressive."). No one could credibly argue that the documents sought are not central to Mr. Donaghy's defense of the restitution claim, and the NBA has apparently abandoned its position (as it must) that production of the documents would be unduly oppressive.

Hon. Carol B. Amon
June 23, 2008
Page 4

games he both officiated and provided picks for during the 2006 – 2007 season,[2] which is the subject of the Information herein.

This claim is particularly troublesome since Mr. Donaghy, throughout his 13 year career with the NBA, was consistently rated as one of the very best officials with the league. He provided valuable services over that period of time, which no one could reasonably dispute. At various times, he was selected to work playoff games, confirming his high performance as a referee. Furthermore, the NBA reviewed all of the games he worked, and there is no suggestion that he compromised any game or made inappropriate calls. Thus, the NBA obtained all of the services it paid for.

In light of the Organization's position, though, Mr. Donaghy is entitled to any documents relating to the NBA's claimed loss in this regard, including records containing his ratings and employment evaluations.

### ii. Purported Assistance to the Government

The NBA claims it should be compensated $247,265.75 for legal fees paid to the law firm of Wachtell, Lipton, Rosen & Katz ("WLRK") and $36,805 in fees paid to Arkin Kaplan Rice, LLP ("AKR"). To support this contention, the NBA submits heavily-redacted billing records revealing that both firms performed significant work on various matters for the Organization.

It is beyond dispute that the FBI investigated the activities of NBA employees unrelated to Mr. Donaghy. Simply put, as the NBA well knows, Organization employees engaged in activities that improperly influenced the outcome of NBA games and prevented fans from paying for games played "on a level playing field." Submission, p.1. This conduct was either directed, or at least allowed to continue, by Organization management. The law firms may have assisted the NBA in dealing with such issues, but we do not know based on the documents included in the Submission.

For example, time records provided by the NBA include nondescript entries such as "Doc review," "multiple emails," 'multiple meetings," "multiple t/c's," "team call," "team themes," "review of articles," "gambling expert call," "gambling trainer," "production," "punishment chart," "Board of Governors meeting," "summarizing news articles," "memos to file," and "making binders," and non-specific meetings with "USAO," "USDOJ," or "FBI." Submission, Tab 2. These entries provide no insight into what matters the attorneys were working on. Mr. Donaghy and the Court are left to speculate as to what the firms did to earn hundreds of thousands of dollars. It goes without saying that attorney time records should be sufficiently detailed so as not to

---

[2] The NBA claims that approximately $49,000 of Mr. Donaghy's salary withheld by the NBA cannot apply towards restitution, citing only New York state law. This theory has no basis under federal law and contradicts the express language of 18 U.S.C. § 3663A. *See United States v. Guthrie*, 64 F.3d 1510, 1515-16 (10th Cir. 1995) (defendant was entitled to have amount of restitution offset by value of services he performed for victim).

Hon. Carol B. Amon
June 23, 2008
Page 5

"impede a precise calculation of the hours reasonably spent" during the representation. *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1265 (2d Cir. 1987) (holding attorney's time records "did not contain sufficient detail" where attorney "described his activities in no more than two or three words for any given day, such as 'Rev. Docs' or 'Clients re testimony.'").

Thus, the Submission fails to divulge what Mr. Donaghy is expected to pay for. The redacted documents provided thus far do not disclose any legal work relating to Mr. Donaghy's conduct and hence do not adequately substantiate the NBA's restitution claim. The Court should be able to review the memoranda, notes, emails, etc. showing what the lawyers were doing and what issues they were working on in order to assess if the time entries relate in any way to Mr. Donaghy.

Therefore, the subpoena requests, among other things, correspondence and memoranda that will disclose the precise legal services provided by the law firms. This information will allow Mr. Donaghy to defend the restitution claim and will provide the Court with real facts as to whether such services fall within 18 U.S.C.C. § 3663A. Likewise, compliance with the subpoena will reveal whether the NBA actually paid any invoices submitted by counsel.

### iii. NBA Employee Salaries

In the Submission, the NBA also adds a claim for $16,750 (not included in the Demand Letter) to cover alleged employee compensation for "reviewing tapes of games in which Donaghy was the referee," purportedly at the government's request. The NBA, however, does not offer any documentation or other explanation as to when or why the government made such a request. Moreover, the NBA did not document the calculation of its supposed monetary loss from use of salaried employees to review those tapes.

The subpoena requests documents that will reveal whether there is support for this claim as well. In light of this new request by the NBA, we also respectfully request an additional document category for the subpoena, to include all documents relating to the NBA's calculation of its supposed monetary loss from the review of videotapes.

### iv. An Unrelated Internal Investigation Dealing With The Activities of Other Referees

Finally, the NBA seeks $516,971.25 in legal fees for the cost of an "internal investigation," which the Organization claims related to the "scope of Donaghy's wrongdoing." Submission, pg. 4. However, on July 24, 2007, NBA Commissioner David Stern announced that the NBA had investigated this matter and found that no

Hon. Carol B. Amon
June 23, 2008
Page 6

other referees were involved in Mr. Donaghy's conduct.[3] Indeed Mr. Stern's comments are not surprising since before July 24, 2007, the Organization was advised that Mr. Donaghy would cooperate completely with federal authorities and that his gambling activities did not involve other referees. Thus, there was no need for an internal investigation of Mr. Donaghy's activities.

Thereafter, the NBA announced that it hired WLRK to conduct a "comprehensive review of the league's rules, policies, and procedures relating to gambling and its officiating program."[4] This investigation had nothing to do with Mr. Donaghy's charged conduct. Indeed, the WLRK time records contain no entries prior to July 28, 2007, indicating that this so-called internal investigation was unrelated to the Donaghy criminal investigation or prosecution. See *Germosen*, 139 F.3d at 130-31. Indeed, the Submission, although otherwise profusely redacted, includes entries for interviews regarding referee "gambling admissions," "proposed revisions to work rules," and "constitutional amendments." Submission, Tab 2, pps.12, 16. These legal expenses, for an internal investigation unrelated to providing assistance to the government, are not recoverable under Section 3663A(b)(4).

Thus, as the NBA well-knows, its demand that Mr Donaghy pay for an investigation about "other referees ... not involved in Donaghy's crimes or [involved] in misconduct of their own" or into "NBA policies and procedures" (Submission p. 2) is simply ridiculous. In any event, the Court needs access to all memoranda, notes, emails, etc. from counsel in order to make factual determinations regarding whether counsel's work relates in any way to Mr. Donaghy.

The subpoena, therefore, seeks documents directly relevant to this internal investigation claim. The subpoena also calls for the production of documents relating to the fees and expenses claimed in conjunction with the NBA's internal investigation. Finally, the subpoena will provide documents showing to what extent these fees were incurred as part of the NBA's attempt to deal with misconduct by referees other than Mr. Donaghy.

---

[3] A transcript of the press conference where Commissioner Stern made these statements is available at http://www.nba.com/news/sternpc_070724.html and copies of the relevant transcript pages are attached hereto as Exhibit B.

[4] A press release announcing the investigation into the NBA's practices and procedures is attached as Exhibit C. The internal investigation concluded that more than half of the NBA's referees violated Organization rules by gambling. Rather than disciplining those referees, the NBA simply changed the policy to permit referees to engage in certain types of gambling. See Howard Beck, *Stern Alters Gambling Restrictions on Referees*, N.Y. Times, October 26, 2007, attached as Exhibit D.

Hon. Carol B. Amon
June 23, 2008
Page 7

**Conclusion**

The NBA's Submission renders nothing "moot" save perhaps the request for restitution herein. If the Court will entertain such a demand, however, then Mr. Donaghy requests the means by which to defend himself. The NBA is no longer claiming that the subpoena is overly broad, but rather that the documents provided answer all of the restitution questions the Court may have in this case. If the NBA truly believes that it is entitled to restitution, then it should have no objection to revealing all of the facts supporting its purported claim so this Court can make its own determination of the NBA's claim herein. For that reason, we respectfully requests that the Court issue the proposed subpoena attached hereto as Exhibit E.[5]

Respectfully,

*John F. Lauro*

John F. Lauro

JFL/gmc


cc:     AUSA Jeffrey A. Goldberg (by U.S. Mail)
        Paul Shechtman, Esq. (by FedEx)
        USPO Brandon T. Maxon (by FedEx)

---

[5] The attached subpoena includes the documents previously sought, but adds two additional categories to cover documents relating to the NBA's amended demand as reflected in the Submission.